UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GILBERTO RODRIGUEZ CHAVERRA, | |
| Plaintiff, | |
| v. | Civil Action No. 18-0289 (JEB) |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | |
| Defendants. | |

### DEFENDANT'S STATEMENT OF MATERIAL FACTS
### <u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>

Defendant, Department of Homeland Security Office of Inspector General (the "Inspector General"), respectfully submits this statement of material facts as to which there is no genuine issue.

**<u>Administrative Record</u>**

1.     On October 16, 2017, Plaintiff submitted, via the Inspector General's FOIA inbox, the FOIA request at issue in this litigation, which was received on October 17, 2017, and assigned case number 2018-IGFO-00007.  *See* Declaration of Roy Jones ("Jones Decl.") ¶ 7; Ex. 1.

2.     Plaintiff's FOIA request sought "all DHS-OIG agency records of investigations, referrals, or contemplated investigations involving (1) any incident or allegation at the U.S. Immigration & Customs Enforcement ("ICE") Stewart Detention Facility in Lumpkin, Georgia occurring on or after January 1, 2015; (2) Any suicide attempt at the Stewart Detention Facility since January 1, 2010; or (3) any allegation or incident involving CCA/CoreCivic or its personnel since January 1, 2010."  Plaintiff's request also stated that "this request includes, but is not limited

to any OIG records relating to the detention, death, or subsequent investigation of Jeancarlo Jimenez Joseph." *See* Jones Decl. ¶ 24; Ex. 1.

3.      On November 2, 2017, the Inspector General sent via email transmission a letter acknowledging Plaintiff's FOIA request and advising that Plaintiff's request would necessitate a thorough and wide-ranging search, and therefore, the Inspector General was invoking a 10-day extension. *See* Jones Decl. ¶ 8; Ex. 2.

4.      The Inspector General's November 2, 2017 acknowledgement letter further advised that the actual time required to respond to the request would depend on the complexity and volume of records located and the Inspector General could not predict exactly when the request would be processed, but would make every effort to comply within a timely manner. *See id.*

5.      On February 8, 2018, Plaintiff filed the Complaint in this case alleging the Inspector General failed to respond to Plaintiff's FOIA request.  *See* ECF No. 1.

6.      On June 4, 2018, the Inspector General filed its Answer to the Complaint. *See* ECF No. 10.

7.      Prior to filing its Answer, the Inspector General began its production of responsive records and on May 25, 2018, the Inspector General issued its first interim response for FOIA request 2018-IGFO-00007. *See* Jones Decl. ¶ 10; Ex. 3.

8.      The Inspector General subsequently released sixteen additional responses as follows:

>  Second Interim Response – May 25, 2018
>  Third Interim Response – July 2, 2018
>  Fourth Interim Response – March 7, 2019
>  Fifth Interim Response – May 13, 2019
>  Sixth Interim Response – June 10, 2019
>  Seventh Interim Response – July 10, 2019
>  Eight Interim Response – August 7, 2019
>  Ninth Interim Response – August 26, 2019

> Tenth Interim Response – September 19, 2019
> Eleventh Interim Response – October 9, 2019
> Twelfth Interim Response – November 13, 2019
> Thirteenth Interim Response – December 16, 2019
> Fourteenth Interim Response – January 13, 2020
> Fifteenth Interim Response – February 10, 2020
> Sixteenth Interim Response – March 16, 2020
> Seventeenth Interim Response – April 7, 2020

*See id.*

9.      The Inspector General's Seventeenth Interim Response was also its final response to Plaintiff's FOIA request.  *See id.*

10.     The Inspector General produced a total of 3,862 pages in response to Plaintiff's FOIA request, of which 11 were withheld in full and 2,533 were withheld in part.  *See* Jones Decl. ¶ 39.

**The Inspector General's Search for Responsive Records**

11.     The Inspector General maintains complaint and investigation-related files in the electronic database, Enterprise Data System ("EDS").  *See id.* ¶ 23.

12.     Hard copies of records related to an investigation may also be stored in case files maintained at the investigating field office and/or the Inspector General Sensitive Compartmented Information Facility.  *See id.*

13.     The Inspector General, however, uses EDS to manage information relating to all complaints and investigations of alleged criminal, civil, or administrative violations by DHS employees, contractors, grantees, beneficiaries, and other individuals and entities associated with DHS, and manage investigations born from those complaints to facilitate the tracking of resources used in investigative activities.  *See id.*

14.    On November 2, 2017, based on the information sought in Plaintiff's FOIA request, the FOIA unit assigned a search tasking to the Office of Investigations, as Plaintiff's request sought "records of investigations, referrals, or contemplated investigations."  *See* Jones Decl. ¶ 25.

15.    The only program office within the Inspector General that conducts, contemplates, and responds to referrals for investigations is the Office of Investigations.  *See id.* 25.

16.    No other program office is reasonably likely to contain responsive records and therefore no other program office was assigned a search task to gather records responsive to Plaintiff's FOIA request.  *See id.*

17.    Shortly after the Office of Investigations was assigned Plaintiff's FOIA request, it determined that the investigation related to Jeancarlo Jimenez Joseph (I17-15215) was ongoing, therefore, the Office of Investigation preserved all records responsive to this request at the time, but decided to withhold those records under FOIA Exemption 7(A).  *See id.* ¶¶ 26.

18.    After the investigation related to Jeancarlo Jimenez Joseph (I17-15215) closed, the Office of Investigations ran another discretionary search on August 12, 2019 for responsive records to the "death, detention, or subsequent investigation of Jeancalo Jimenez Joseph," by searching EDS and by searching the field office that conducted this investigation, which gathered all records saved in the case file for that investigation located in the field office.  *See id.* ¶ 26 n.1.; Ex. 1.  Thereafter, all records responsive to this request were produced to Plaintiff on August 26, 2019.  *See id.*

19.    Meanwhile, after being assigned the initial search tasking, the Office of Investigations ran an initial search of EDS using search terms and parameters derived from Plaintiff's FOIA request to gather a list of all complaints and investigations responsive to items 1 through 3 of Plaintiff's request.  *See id.* ¶¶ 26-27.

20.     After Plaintiff filed the Complaint in this matter, however, the Inspector General conferred with Plaintiff to discuss Plaintiff's concerns over the appropriate scope of any search responsive to Plaintiff's request.  *See id.* ¶¶ 28-29.

21.     Based on these discussions, the Office of Investigations ran a second search in May 2018 for all complaints and investigations maintained in EDS, responsive to items 1 through 3 of Plaintiff's request.  *See id.* ¶ 29.

22.     This second search sought all complaints and investigations that pertained to ICE, from the period of January 1, 2015 to May 2, 2018 and that contained in the search terms "Stewart Detention Facility" or "Stewart Detention Facility" and "suicide" and all complaints and investigations from the same period that contained the search terms "CCA" or "Core Civic."  *See id.*  The results of this search yielded an Excel spreadsheet containing all potentially responsive complaints and investigations that met the criteria of the Office of Investigations' second May 2018 search, ("May 2018 Spreadsheet"), which the Office of Investigation returned to the FOIA unit for a further responsiveness review.  *See id.*

23.     Plaintiff then agreed to the Inspector General producing only the Reports of Investigation ("ROIs") for responsive investigations identified from the May 2018 search, with the understanding that after Plaintiff reviewed these ROIs, Plaintiff would follow-up with any request for the underlying investigation records related to any particular ROI.  *See id.* ¶ 31.

24.     Based on the May 31, 2018 discussion, a request was sent to the Office of Investigations to begin pulling responsive ROIs from EDS, but no field offices were searched, with the understanding that after Plaintiff reviewed these ROIs, Plaintiff would follow up with any request for the underlying investigation records related to any particular ROI.  *See id.*

25.    On July 2, 2018, the Inspector General issued a second interim response producing the records responsive to Plaintiff's request for ROIs, which identified eleven investigations responsive to Plaintiff's FOIA request, for which it produced the ROIs and related Memorandum Activity.  *See id.* ¶ 32.

26.    Plaintiff never indicated to the Inspector General that Plaintiff wanted any additional records related to the underlying investigations associated with the ROIs, thus  the Inspector General then indicated that the only type of record responsive to Plaintiff's request that remained at issue were 1,000 complaints identified as potentially responsive to items 1-3 of Plaintiff's FOIA request.  *See id.*

27.    The parties then spent a significant amount of time conferring to narrow the type of complaint that Plaintiff wanted the Inspector General to produce.  *See id.* ¶¶ 32-37; *see also* Joint Status Report, ECF No. 20; Joint Status Report, ECF No. 22; Joint Status Report ECF No. 24.

28.    To resolve this remaining issue as to the outstanding complaints, Plaintiff asked to review a spreadsheet containing a list of unsubstantiated complaints identified in response to Plaintiff's FOIA request.  *See* Jones Decl. ¶ 33.

29.    On September 10, 2018, the Inspector General produced to Plaintiff a spreadsheet of the unsubstantiated complaints that were identified in the May 2018 Spreadsheet gathered from the Office of Investigation's second search conducted in May 2018.  *See id.* ¶¶ 34 & n.4.

30.    After reviewing the spreadsheet of unsubstantiated complaints and requesting the Inspector General produce a representative sampling of complaint materials, to which the Inspector General complied, Plaintiff eventually informed the Inspector General that Plaintiff wanted all materials related to the unsubstantiated complaints identified from the May 2018 Spreadsheet and no other documents.  *See id.* ¶¶ 35-37.

31.    The Office of Investigations then ran a search of EDS to gather all material related to the unsubstantiated complaints identified from the May 2018 Spreadsheet and produced that material to Plaintiff on a rolling basis until it made its final production on April 7, 2020.  *See id.* ¶¶ 38-39; Joint Status Report, ECF No. 27 at 2.

32.    Meanwhile, after the investigation related to Jeancarlo Jimenez Joseph (I17-15215) closed, rather than producing only the records the Office of Investigations had previously withheld at the time it ran its initial search for all records responsive to the "detention, death, or subsequent investigation of Jeancarlo Jimenez Joseph," the Office of Investigations ran another discretionary search in August 2019 for responsive records to this request by searching EDS and by searching the field office that conducted this investigation, which gathered all records saved in the case file for that investigation located in the field office.  *See id.* ¶ 26 n.1.  Thereafter, all records responsive to this request were produced to Plaintiff on August 26, 2019.  *See id.*

**The Inspector General's Withholdings**

*Exemption 5*

33.    The Inspector General invoked Exemption 5 to withhold 11 pages in full comprising draft investigative material, specifically draft Memorandum of Activity, which are "enclosures to its reports of investigation and typically consist of interviews of witnesses and/or summarization of actions taken during the course of an ongoing investigation."  *Id.* ¶ 49.

34.    The draft Memorandum of Activity in this case were specifically attached to responsive emails sent between employees within the Office of Investigation for internal review. *Id.* ¶¶ 45, 48.

35.     While the Inspector General has produced final versions of these draft Memorandum of Activity, the draft versions withheld in full have never been shared publicly and remain in draft form. *See id.* ¶¶ 48-49, 52.

36.     The draft Memorandum of Activity "an integral part of the Inspector General's Office of Investigations decision-making process that relate to open investigation." *Id.* ¶ 50.

37.     Until finalized, draft Memorandum of Activity are reviewed for edits and comments by the "reviewing official," which can affect the scope and direction of a the Inspector General ongoing investigation, and therefore do not reflect a final decision by the agency in the investigation. *See id.* ¶¶ 50-51.

38.     The Inspector General conducted a foreseeable harm analysis to ensure it withheld only information it reasonably foresees the disclosure of which would harm an interest protected by Exemption 5. *See id.* ¶ 51.

39.     The Inspector General determined that revealing these draft Memorandum of Activity could cause foreseeable harm to "the quality of [the agency's] decision" by implicating two interests protected by the deliberative process privilege: candor and confusion of the Agency's policies. *Id.*

40.     Specifically, releasing the draft Memorandum of Activity would cause a "chilling effect on communication between agency employees that hinder the exchange of ideas, including ideas, questions, and concerns regarding the scope and direction of a DHS OIG ongoing investigation." *Id.*

41.     In addition, providing the public access to the draft investigative documents could "lead to significant public confusion, and the public dissemination of inaccurate information and

conclusions regarding the investigation prior to the Inspector General finalizing and releasing its final outcome and report." *Id.*

**Exemption 7 Threshold**

42.     The Inspector General is a law enforcement agency. *See id.* ¶ 54.

43.     One of the Inspector General's primary functions and operations is to "investigate allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs." *See id.* ¶¶ 22, 55.

44.     The records that the Inspector General redacted in part comprise Reports of Investigation and Memorandum of Activity, which document the Inspector General's investigatory processes and which can lead to criminal prosecutions or administrative actions. *See id.* ¶ 54; Ex. 5.

**Exemption 6 and 7(C)**

45.     The Inspector General uses Exemptions 6 and 7(C) in concert. *See id.*

46.     In reviewing the responsive records, the Inspector General withheld the names and other identifying information that apply to an individual, including the Inspector General's subjects, witnesses, complainants, and third parties mentioned or involved in the Inspector General investigation, including medical professionals and lower-level government employees; the Inspector General also withheld the names of other identifying information of DHS lower-level investigative personnel and law enforcement officers. *See id.* ¶ 55.

47.     Other identifying information includes alien numbers, email addresses, direct telephone numbers, signatures, and identifying physical characteristics. *See id.*

48.    The Inspector General determined that all of these individuals have a substantial privacy interest that would be implicated by the public release of the law enforcement investigative materials.  *See* ¶¶ 55, 57-61.

49.    In contrast, disclosing personal information about these individuals would not shed light on or significantly increase the public's understanding of the Inspector General's operations and activities, which is to investigate criminal, civil, and administrative misconduct of DHS employees, which the compiled Reports of Investigation and finalized Memorandum of Activity provide instead.  *See id.* ¶¶ 57-61.

50.    In addition, under Inspector General Act of 1978, the Inspector General has a statutory obligation to protect a complainant's or witness's identity, which factored into the Inspector General's analysis in asserting Exemption 6 and Exemption 7(C).  *See id.* ¶¶ 57, 59

51.    Plaintiff provided no authorization from those third parties, whose name and other identifying information was withheld, that would otherwise permit the Inspector General to release their records to Plaintiff, nor supplied proof of death.  *See id.* ¶ 55.

52.    The Inspector General then balanced the privacy interest of these individuals with any FOIA public interest and determined that disclosure of their names and other identifying information would amount to a clearly unwarranted invasion of their personal privacy. *See id.* ¶¶ 58-63

**The Inspector General's Compliance with Segregability**

53.    The Inspector General performed a line-by-line review of all records produced to Plaintiff to identify all information exempt from disclosure or for which a discretionary waiver of exemption could be applied.  *See id.* ¶ 69.

54.    With respect to the records that were released, all information not exempted from disclosure pursuant to the FOIA Exemptions specified above was correctly segregated and non-exempt portions were released.  *See id.* ¶ 70.

55.    The Inspector General did not withhold any non-exempt information on the grounds that it was non-segregable.  *See id.*

56.    Any further release of information would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions.  *See id.*

*      *      *

Dated: June 16, 2023                      Respectfully submitted,

                                          MATTHEW M. GRAVES
                                          D.C. Bar No. 481052
                                          United States Attorney

                                          BRIAN P. HUDAK
                                          Chief, Civil Division

                         By:     */s/ Anna D. Walker*
                                          ANNA D. WALKER
                                          Assistant United States Attorney
                                          601 D Street, NW
                                          Washington, DC 20530
                                          Phone:  (202) 252-2544
                                          anna.walker@usdoj.gov

                                          *Counsel for the United States of America*

11