UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GILBERTO RODRIGUEZ CHAVERRA,

Plaintiff,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

Defendants.

Civil Action No. 18-0289 (JEB)

**DECLARATION OF ROY JONES**

## I.    INTRODUCTION

I, Roy Jones, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am the Freedom of Information Act ("FOIA") Officer and Chief of the Information Law and Disclosure Division ("ILD") in the Office of Counsel at the United States Department of Homeland Security Office of Inspector General ("DHS OIG"), and I have served in this capacity since March 2021. I have over five years of FOIA experience and six years of supervisory experience, which includes handling FOIA litigation as an Associate Legal Advisor and Deputy Chief of the Government Information Law Division at the U.S. Immigration and Customs Enforcement.

2.    As the FOIA Officer for the DHS OIG, I supervise the Deputy FOIA Officer, four (4) Government Information Specialists, and one (1) Intake Specialist. I manage the oversight of the daily operations of FOIA processing from intake to closeout, assess the agency's FOIA program, brief agency leadership on the status of the FOIA program, and provide technical

assistance to ensure agency compliance with the FOIA.  As the FOIA Officer, I assist ILD attorneys serving as agency counsel in FOIA litigation, including records production.

3.      DHS OIG's FOIA Unit is housed within ILD.  The FOIA Unit is responsible for receiving, processing, and responding to all FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received by DHS OIG.

4.      My official duties and responsibilities related to the FOIA include first line processing of FOIA and Privacy Act requests received by DHS OIG and second line reviews of FOIA requests processed by Government Information Specialists.  Due to my experience and the nature of my official duties, I am familiar with DHS OIG's procedures for searching and responding to requests for information pursuant to provisions of the FOIA and the Privacy Act.  I am familiar with DHS OIG's processing of the FOIA request dated October 16, 2017, filed by Plaintiff, which is the subject of this litigation.

5.      The statements contained in this declaration are based upon my personal knowledge, my review of records kept by DHS OIG in the ordinary course of business, and information provided to me by other DHS OIG employees in the course of my official duties.

6.      This declaration is made in support of Defendant DHS OIG's search and withholdings under the FOIA in response to Plaintiff's FOIA request 2018-IGFO-00007.

II.      **PROCEDURAL HISTORY OF THE PLAINTIFF'S FOIA REQUEST AND THE INSTANT LITIGATION**

7.      On October 16, 2017, Plaintiff submitted, via DHS OIG's FOIA inbox, the FOIA request at issue in this litigation.  The request was received on October 17, 2017, and assigned case number 2018-IGFO-00007.  *See* Ex. 1

8.      On November 2, 2017, DHS OIG sent via email transmission a letter acknowledging Plaintiff's FOIA request and advising that Plaintiff's request would necessitate a

thorough and wide-ranging search, and therefore, DHS OIG was invoking a 10-day extension. DHS OIG further advised that the actual time required to respond to the request would depend on the complexity and volume of records located and DHS OIG could not predict exactly when the request would be processed, but would make every effort to comply within a timely manner. *See* Ex. 2.

9.      On February 8, 2018, Plaintiff filed the Complaint in this case alleging DHS OIG failed to respond to Plaintiff's FOIA request. *See* ECF No. 1. DHS OIG filed its Answer on June 4, 2018. *See* ECF No. 10.

10.     Prior to filing its Answer, DHS OIG started to process responsive records. On May 25, 2018, DHS OIG issued its first interim response. DHS OIG subsequently released sixteen additional interim responses:

> Second Interim Response – May 25, 2018
> Third Interim Response – July 2, 2018
> Fourth Interim Response – March 7, 2019
> Fifth Interim Response – May 13, 2019
> Sixth Interim Response – June 10, 2019
> Seventh Interim Response – July 10, 2019
> Eight Interim Response – August 7, 2019
> Ninth Interim Response – August 26, 2019
> Tenth Interim Response – September 19, 2019
> Eleventh Interim Response – October 9, 2019
> Twelfth Interim Response – November 13, 2019
> Thirteenth Interim Response – December 16, 2019
> Fourteenth Interim Response – January 13, 2020
> Fifteenth Interim Response – February 10, 2020
> Sixteenth Interim Response – March 16, 2020
> Seventeenth Interim Response – April 7, 2020

DHS OIG's Seventeenth Interim Response was also its final response to Plaintiff's FOIA request. *See* Ex. 3.

11.     This declaration provides a description of DHS OIG's search in response to Plaintiff's FOIA request 2018-IGFO-00007 and provides the basis under which information has been withheld under the FOIA.

### III.    DHS OIG'S STANDARD PROCEDURE FOR INITIATING SEARCHES IN RESPONSE TO FOIA REQUESTS

12.     When the DHS OIG receives a FOIA request, the FOIA Unit evaluates it to determine if it is a proper FOIA request per DHS FOIA regulation 6 C.F.R. § 5.3.  Generally, a FOIA request is considered proper and in compliance with DHS regulations if it is made in writing, it reasonably describes the records sought, and the records are under the purview of DHS OIG.

13.     Pursuant to 6 C.F.R. § 5.3(c), if a FOIA request does not reasonably describe the records sought or it is improperly submitted, the FOIA Unit may seek clarification from the requestor or administratively close the request.  If the FOIA request seeks records under the purview of a government agency other than DHS or a component other than DHS OIG, the FOIA unit will refer the request to that government agency or component and inform the requestor to contact that agency or component directly and DHS OIG will administratively close the FOIA request.

14.     Perfected FOIA requests are entered into a database known as FOIAXpress and assigned a case tracking number and FOIA processor.  Based upon the requestor's description of the records being sought and the FOIA Unit's knowledge of the various program offices' missions, the FOIA processor identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches.

15.     The program offices are typically staffed with a designated point of contact ("POC") who is the primary person responsible for communications between that program office

and the FOIA Unit. Each POC is a person with detailed knowledge about the operations of their particular program office.

16.     The POC within each of those program offices is provided with a copy of the FOIA request, an email detailing the FOIA request, instructions to conduct a search for responsive records and a search form to document information such as search terms, databases searched and any other program offices believed to have responsive records. As the program offices are best positioned to determine where responsive records are located, they are responsible for searching all locations and by all keywords that the program office reasonably believes would produce responsive records. The POC then reviews the FOIA request, along with any case-specific instructions that may have been provided, and based on the POC's experience and knowledge of the program office's practices and activities, forwards the request and instructions to the individual employee(s) within the program office that the POC believes is reasonably likely to have responsive records, if any. Once those searches are completed, the individual(s) and program offices provide any potentially responsive records along with a completed search form to the POC who will forward the potentially responsive records to the assigned FOIA processor. The FOIA processor then reviews the records for responsiveness, applies any appropriate FOIA exemptions, and sends any necessary referrals and/or consultations.

17.     DHS OIG employees maintain records in several ways and DHS OIG program offices use various systems to maintain these records. DHS OIG employees may store electronic records on their individual computer hard drives, their program office's shared drive, databases, DVDs, CDs, and/or USB storage devices. The determination of whether or not these electronic locations must be searched in response to a particular FOIA tasking, as well as how to conduct any necessary searches, is necessarily based on the manner in which employees maintain their files.

18.     DHS OIG employees may also maintain hard copies of records, such as investigation files, which may be stored and maintained with an employee's office and/or the DHS OIG Sensitive Compartmented Information Facility ("SCIF"), depending on whether the records are classified.

19.     Additionally, all DHS OIG employees have access to e-mail. DHS OIG uses the Microsoft Outlook e-mail system. Each OIG employee stores their files within Outlook in the way that works best for that particular employee. It is incumbent on the OIG employee to complete a timely search of the locations that have potentially responsive records.

20.     Once records are received, the FOIA processor will make a determination whether or not the records are responsive to the FOIA request. If the records are responsive, the FOIA processor uploads the records into the FOIA processing system, redacts information pursuant to the FOIA or Privacy Act, as appropriate, while simultaneously ensuring that all reasonably segregated non-exempt information is released. The FOIA processor also considers any foreseeable harm while processing records.

21.     Once the responsive records are processed by the FOIA processor, a second-line review of the records is conducted. Once the second-line review is completed, the records are produced to the requestor as either an interim or final response.

## IV.    GENERAL DESCRIPTION OF PROGRAM OFFICE TASKED WITH SEARCHING FOR RECORDS IN RESPONSE TO PLAINTIFF'S FOIA REQUEST 2018-IGFO-00007 AND THE RESULTING SEARCH

22.     **Office of Investigations Searches**. The Office of Investigations conducts investigations into allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs. These investigations can result in criminal prosecutions, fines, civil monetary penalties, administrative sanctions, and personnel

actions.    Additionally, The Office of Investigations provides oversight and monitors the investigative activity of DHS' various internal affairs offices.

23.    DHS OIG maintains complaint and investigation related files in the electronic Enterprise Data System ("EDS").  Hard copies of records related to an investigation may also be stored in case files maintained at the investigating field office and/or the DHS OIG SCIF.  EDS, however, is the official DHS OIG electronic case management system.  DHS OIG uses EDS to manage information relating to all complaints and investigations of alleged criminal, civil, or administrative violations by DHS employees, contractors, grantees, beneficiaries, and other individuals and entities associated with DHS, and manage investigations resulting from those complaints to facilitate the tracking of resources used in investigative activities.

24.    Plaintiff's FOIA request sought "all DHS-OIG agency records of investigations, referrals, or contemplated investigations involving (1) any incident or allegation at the U.S. Immigration & Customs Enforcement ("ICE") Stewart Detention Facility in Lumpkin, Georgia occurring on or after January 1, 2015; (2) Any suicide attempt at the Stewart Detention Facility since January 1, 2010; or (3) any allegation or incident involving CCA/CoreCivic or its personnel since January 1, 2010."  Plaintiff also stated that "this request includes, but is not limited to any OIG records relating to the detention, death, or subsequent investigation of Jeancarlo Jimenez Joseph."  *See* Ex. 1.

25.    On November 2, 2017, the FOIA unit assigned a search tasking to the Office of Investigations to address Plaintiff's request seeking "records of investigations, referrals, or contemplated investigations."    The only program office within DHS OIG that conducts, contemplates, and responds to referrals for investigations is the Office of Investigations. Accordingly, the FOIA unit determined that no other program office was reasonably likely to

contain responsive records and therefore no other program office was assigned a search tasking to gather records potentially responsive to Plaintiff's FOIA request.

26.    Shortly after the search tasking was assigned to the Office of Investigations, the Office of Investigations determined that an open and ongoing investigation (I17-15215) was related to the named subject in the Plaintiff's FOIA request, Jeancarlo Jimenez Joseph.  Therefore, the Office of Investigations notified the FOIA Unit that an investigation was open and ongoing and any investigative records disclosed could harm the integrity of the investigation, and thus it determined that any records responsive to this request would have been exempt under FOIA Exemption 7(A).  The Office of Investigations determined, however, that it would process the search taskings for records potentially responsive to Plaintiff's FOIA request items 1 through 3.[1]

27.    To gather potentially records responsive to items 1 through 3 of Plaintiff's FOIA request, the Office of Investigations searched for records located in the electronic case management system using terms and parameters derived from Plaintiff's FOIA Request and forwarded the results of this search to the FOIA unit for a further responsiveness review.  *See infra* Paragraph 29 n.2.

---

[1]    After the investigation (I17-15215) related to the named subject in the Plaintiff's FOIA request, Jeancarlo Jimenez Joseph closed, the Office of Investigations performed a further discretionary search for all records involving the detention, death, or subsequent investigation of Jeancarlo Jimenez Joseph by searching EDS.  As this request also sought all underlying records related to this investigation, the investigating field office was also searched on August 12, 2019 by gathering all records saved in the case file for that investigation located at the field office.  All records responsive to this request were produced to Plaintiff on August 26, 2019 in the Agency's Ninth and Tenth Interim Responses.  In doing so, the Office of Investigation search for responsive records extended to every location where it was reasonably likely that responsive records would be found.  DHS OIG's Ninth Interim Response, specifically, consisted of DHS OIG's complete final report and investigative file for investigation (I17-15215), which also contained within that investigative file a complete copy of Georgia Bureau of Investigation's investigative file.  The Tenth Interim Response consisted of emails pertaining to Mr. Jimenez Joseph.

28.    While the FOIA unit was reviewing the results of this initial search, Plaintiff filed the Complaint in this case on February 8, 2018.  *See* Compl., ECF No. 1.

29.    The parties then engaged in several discussions regarding Plaintiff's concerns over the appropriate scope of search that would reasonably capture records responsive to Plaintiff's request.  Based on these conversations, and to address Plaintiff's concerns, on May 15, 2018, the FOIA unit sent a second search tasking to the Office of Investigations for an expedited search of all responsive records enumerated in the format of an Excel spreadsheet, which included all complaints, referrals and investigations identified by searching EDS with the following parameters: (1) Agency: ICE, Date range: January 1, 2015 to May 2, 2018, and Search terms: "Stewart Detention Facility"; (2) Agency: ICE, Date range: January 1, 2010 to May 2, 2018, and Search terms: "Stewart Detention Facility" and "suicide"; (3) Date range: January 1, 2010 to May 2, 2018 and Search terms: "CCA" or "CoreCivic."  On May 16, 2018, the Office of Investigations returned an Excel spreadsheet to the FOIA unit's May 15, 2018 search tasking. The Excel spreadsheet indicated that this second search yielded approximately 1,001 complaints and 34 investigations.  The Office of Investigations then forwarded this spreadsheet to the FOIA unit for a further responsiveness review.[2]

30.    On May 25, 2018, DHS OIG issued its First Interim Response advising that the DHS OIG investigation into the Jeancarlo Jimenez Joseph matter was ongoing and had not

---

[2]    For requests that do not seek a specific investigation or complaint by name or case number, the Office of Investigations will run a search using specific parameters to pull all complaints, investigations, and/or referrals that may be related to the specific topic of the FOIA request in the format of an excel spreadsheet.  Once the Office of Investigation has complied the list of potentially responsive complaints, investigation, and/or referrals it is forwarded to the FOIA unit.  The FOIA unit will then further review the excel spreadsheet to determine what records are truly responsive to a FOIA request and then request that the Office of Investigations pull those specific records for processing and production.

concluded. DHS OIG, therefore, notified Plaintiff that DHS OIG invoked Exemption 7(A) of the FOIA, 5 U.S.C. § 552 (b)(7)(A) for those records. Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes . . . to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." DHS OIG further advised that the FOIA unit would continue to search for records responsive to Plaintiff's FOIA request items 1, 2, and 3 and make productions of any non-exempt information responsive to items 1, 2, and 3 thereafter. This initial response, thus, did not include the production of any responsive records pursuant to Exemption 7(A).[3]

31.    On May 24, 2018, DHS OIG, through counsel, requested Plaintiff narrow Plaintiff's request based on the search results from its May 15, 2018 search tasking. DHS OIG informed Plaintiff if every complaint and investigation was pulled it would likely result in over 20,000 pages of records. On May 31, 2018, in response to DHS OIG's email, Plaintiff indicated that Plaintiff would prefer to start with Reports of Investigations ("ROIs") and once the ROIs had been produced in redacted form, a discussion could follow as to which investigations Plaintiff would seek underlying records. Based on the May 31, 2018 discussion, a supplemental request was sent to the Office of Investigations to begin pulling responsive ROIs from EDS. In doing so, the Office of Investigation's search for responsive records extended to the only location where it was reasonably likely that responsive records would be found. Based on Plaintiff's request for ROIs no field offices were searched at this juncture since the requested ROIs were housed in EDS, and the understanding that after Plaintiff reviewed these ROIs, Plaintiff would follow up with any request for the underlying investigation records related to any particular ROI.

---

[3]    The DHS OIG investigation into the Jeancarlo Jimenez Joseph matter concluded on July 30, 2019. The Agency produced records responsive to this request to Plaintiff in DHS OIG's Ninth Interim Release on August 26, 2019 and Tenth Interim Release on September 19, 2019.

32.     On July 2, 2018, DHS OIG issued its Second Interim Response producing records responsive to Plaintiff's request for ROIs.  *See* Ex. 3 at 3.  Specifically, it identified and produced the ROIs related to three closed substantiated investigations, four closed unsubstantiated investigations and four ongoing investigations responsive to Plaintiff's FOIA request.  Plaintiff never indicated to DHS OIG that Plaintiff wanted any additional records related to the underlying investigations associated with the ROIs.  Accordingly, DHS OIG then indicated with its Second Interim Response, that all ROIs and related Memorandum of Activity had been produced that were responsive to items 1, 2, and 3 of Plaintiff's FOIA request and the remaining responsive records to Plaintiff's request items 1-3, included approximately 1,000 complaints.  Due to the amount of records that remained to be processed, DHS OIG counsel offered to provided Plaintiff, though counsel, with the opportunity to review a spreadsheet of these complaints, to assist in narrowing the production to those complaints that were of interest to Plaintiff.  *See* Joint Status Report, ECF No. 20; Joint Status Report, ECF No. 22.

33.     On September 10, 2018, Plaintiff, through counsel, responded to DHS OIG's proposal indicating that a review of a spreadsheet containing unsubstantiated complaints in response to Plaintiff's FOIA request would aid in resolving Plaintiff's remaining claims as to the outstanding complaints.  Plaintiff further proposed, through counsel, that DHS OIG supply Plaintiff a copy of the spreadsheet for review, from which Plaintiff would identify any specific documents they would want to identify for production.

34.     On September 20, 2018, DHS OIG issued its Third Interim Response, which consisted of a spreadsheet of all unsubstantiated complaints for Plaintiff's review and

determination as to whether they were interested in receiving the full complaint records for any

individual complaints.[4]  *See* Ex. 3 at 7.

35.     On March 5, 2019, DHS OIG was informed that Plaintiff sought a representative

sample from the spreadsheet of complaints for each of the following four categories:

Segregation/Solitary Confinement, Medical Grievance and Treatment, Assaults, and Access to

Court.  In an effort to resolve Plaintiff's concerns and challenges as to how to narrow the set of

complaints for the agency to process, DHS OIG agreed.  *See* Joint Status Report, ECF No. 24 at 2.

36.     On March 7, 2019, DHS OIG issued it Fourth Interim Response, which consisted

of a representative sample of complaints in accordance with Plaintiff's request.  *See* Ex. 3 at 10.

37.     On March 28, 2019, Plaintiff sent an email to Defendant's Counsel, indicating that

Plaintiff wanted DHS OIG to produce all unsubstantiated complaint materials on a rolling basis

and no other documents.  *See* Joint Status Report, ECF No. 24 at 2; Joint Status Report, ECF No.

27 at 2.  Accordingly, following Plaintiff's request, DHS OIG sent a request to the Office of

Investigations on April 5, 2019, to pull all responsive unsubstantiated complaint materials from

the May 16, 2018 spreadsheet for review and production under the FOIA, which the Office of

Investigations gathered from EDS.  In doing so, the Office of Investigation's search for responsive

records extended to the only location where it was reasonably likely that responsive records would

be found.

---

[4]     This spreadsheet of unsubstantiated complaints was created using the data gathered from
the same spreadsheet the Office of Investigations had gathered in response to the FOIA unit's
second search tasking on May 15, 2018 identifying all approximately 1,000 responsive complaints
by searching EDS according to the following search parameters: (1) Agency: ICE, Date range:
January 1, 2015 to May 2, 2018, and Search terms: "Stewart Detention Facility"; (2) Agency: ICE,
Date range: January 1, 2010 to May 2, 2018, and Search terms: "Stewart Detention Facility" and
"suicide"; (3) Date range: January 1, 2010 to May 2, 2018 and Search terms: "CCA" or
"CoreCivic.

38.     Following the Office of Investigations' search for all responsive complaint materials gathered from EDS, DHS OIG processed these records and released them to Plaintiff on a rolling basis in interim responses five through seventeen and its final response, of which all responses, with the exception of the Ninth and Tenth Interim Response, consisted of complaints responsive to Plaintiff's FOIA request.

39.     DHS OIG finished its production on April 7, 2020, producing 3,862 pages of responsive records to Plaintiff, 11 were withheld in full, and 2,533 were withheld in part.

40.     During its review of responsive records, DHS OIG referred records to the U.S. Immigration Customs Enforcement ("ICE"). DHS OIG referred 210 pages of records on July 2, 2018, six pages of records on March 7, 2019, 261 pages of records on August 26, 2019, and one page on September 19, 2019 for ICE's review and processing.[5]

41.     After DHS OIG completed its production, counsel for Plaintiff engaged with counsel for Defendant to try to narrow the scope of disputes at issue with DHS OIG's productions. The efforts of these discussions culminated with Plaintiff's submission on May 23, 2022 of a letter to Defendant's counsel identifying Plaintiff's issues with DHS OIG's search, production, and referrals, and general issues with withholdings.

42.     On November 2, 2022, DHS OIG formally responded to this May 23, 2022 letter, resolving Plaintiff's concerns with DHS OIG's production and referrals. On February 13, 2023, Plaintiff, through counsel, further represented that Plaintiff was not challenging DHS OIG's withholdings contained in interim responses 11-17, but would continue to challenge the hundreds

---

[5]     Neither this declaration, nor DHS OIG's motion for summary judgment, addresses the propriety of any of ICE's withholdings to the documents that DHS OIG referred to ICE, which will be addressed separately in ICE's separate motion for summary judgment in this matter. *See* Joint Status Report, ECF No. 75 at 2.

of pages withheld in part pursuant to Exemption 6 and 7(C) and would continue to challenge all

11 pages of draft Memorandum of Activity that DHS OIG withheld in full pursuant to Exemption

5.  DHS OIG notes that it produced all final versions of the same Memoranda of Activity in its

Tenth Interim response. *See* Ex. 4; *see also* Joint Status Report, ECF No. 75 at 2.

## V.    EXPLANATION OF FOIA EXEMPTION WITHHOLDINGS

### Exemption 5

43.    Plaintiff has challenged (a) all Exemption 5 claims and (b) all pages withheld in

full.  Here, DHS OIG withheld a total of 11 pages in full in its production pursuant to Exemption

5, which are also the only pages to which DHS OIG applied Exemption 5.  Thus, Plaintiff's

challenge to all Exemption 5 claims and all pages withheld in full apply to the same 11 pages of

documents produced in response to Plaintiff's FOIA request.

44.    Exemption 5 of the FOIA protects "inter-agency or intra-agency memorandum or

letters that would not be available by law to a party other than an agency in litigation with the

agency." 5 U.S.C. § 552(b)(5).  Exemption 5 incorporates three privileges: Deliberative Process,

Attorney-Work Product, and Attorney-Client Privilege.

45.    As a threshold matter, in order to withhold records or information from release

pursuant to Exemption 5 of the FOIA, they must be inter- or intra-agency records.  Here, DHS

OIG invoked the deliberative process privilege of Exemption 5 to protect drafts of investigative

documents, specifically draft Memorandum of Activity, that were attached to responsive emails

sent between employees within the Office of Investigations.

46.    Deliberative process privilege "covers recommendations, draft documents,

proposals, suggestions, and other subjective documents which reflect the personal opinions of the

14

writer rather than the policy of the agency." *See Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 867 (D.C. Cir. 1980).

47.    Three policy purposes have been held to constitute the bases for the deliberative process privilege: "(1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are actually adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action."[6]

48.    Courts have established two requirements for the deliberative process privilege: 1) the communication must be pre-decisional and 2) the communication must be deliberative. *See Mapother v. Dep't of Just.*, 3 F.3d 1533, 1537 (D.C. Cir. 1993).

49.    As to these 11 pages, DHS OIG withheld them in full under Exemption 5 as draft investigative material, specifically draft Memoranda of Activity.  DHS OIG's Memorandum of Activity are enclosures to its reports of investigation and typically consist of interviews of witnesses and/or summarization of actions taken during the course of the ongoing investigation. The Memorandum of Activity withheld in this instance is in draft form as they had not yet been finalized, nor shared publicly; thus, they are pre-decisional.  These records are preliminary versions of enclosures to DHS OIG's ROIs, thus containing opinions and recommendations of the investigating officers. There records are shared through internal discussions for review and discussion amongst the investigating officer and reviewing official, they are both pre-decisional and deliberative, as they remain in draft form.

---

[6]    *McCann v. U.S. Dep't of Health & Hum. Servs.*, 828 F. Supp. 2d 317, 321 (D.D.C. 2011); *see Coastal States*, 617 F.2d at 866; *CREW v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp. Inc. v. IRS*, 698 F. Supp. 2d 66, 81 (D.D.C. 2010).

50.    In addition, the 11 pages of draft Memorandum of Activity are also deliberative. As reflected in DHS OIG's *Vaughn* Index, Ex. 5, these records had not been finalized through the review of the "reviewing official," and therefore do not reflect a final decision by the agency in the investigation.[7]  Prior to finalizing DHS OIG's Reports of Investigation, these records are reviewed for edits and comments.  Thus, these records are considered an integral part of DHS OIG's Office of Investigations decision-making process that relate to open investigations. Final reports have to be signed by the reviewing official to be considered "final;" none of the withheld drafts were signed by the reviewing official and thus were not considered final.

51.    In reviewing the records, DHS OIG considered the foreseeable harm standard.  See 5 U.S.C. § 552(a)(8)(A)(i)(I).  The release of the agency's draft documents would cause harm to the agency's deliberative process and the quality of its decisions.  DHS OIG's Memorandum of Activity are drafted by the investigating Special Agent in the Office of Investigations and subsequently review by the "Reviewing Official," in the Office of Investigations, which is typically the supervising Assistant Special Agent in Charge or Special Agent in Charge for review, comments, and edits prior to finalizing.  The release of these documents prior to them being finalized will have a chilling effect on communication between agency employees and hinder the exchange of ideas, including ideas, questions, and concerns regarding the scope and direction of a DHS OIG ongoing investigation.  Further, providing the public access to DHS OIG's draft investigative documents could lead to significant public confusion, and the public dissemination

---

[7]    *See Hamilton Sec. Group Inc. v. HUD*, 106 F. Supp. 2d 23, 30 (D.D.C. 2000) (protecting draft audit report that was never reviewed by agency decisionmaker; holding that "only those materials that are reviewed and approved by the District Inspector General represent the agency's final position").

of inaccurate information and conclusions regarding the investigation prior to DHS OIG finalizing and releasing its final outcome and report.

52.     Although DHS OIG withheld the draft versions of the 11 pages of Memorandum of Activity in full under exemption 5, the final versions of these same documents were released to Plaintiff within the same FOIA production.  DHS OIG's Tenth Interim response contained both the draft documents withheld in full under Exemption 5 and the finalized released copies of the documents withheld in part with applicable (b)(6) and (b)(7)(C) exemptions.[8]

### Exemptions 6 and 7(C)

53.     Exemption 6 allows the withholding of information from disclosure that would constitute "a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) protects from public disclosure "records or information complied for law enforcement purpose… [if disclosure] could be reasonably be expected to cause an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

54.     As a law enforcement agency, DHS OIG uses Exemptions 6 and 7(C) in concert. When determining whether to withhold information under 7(C), DHS OIG first assessed whether the records complied were for a law enforcement purpose.  The records collected here consisted of Reports of Investigations and Memorandum of Activity, which document the DHS OIG's investigatory processes and can lead to criminal prosecutions or administrative actions. Therefore, it was determined that these investigative records were compiled for a law enforcement purpose.

---

[8]     Those pages withheld in full under Exemption (b)(5) are located at DHS-OIG 1686, 1688, 1701, 1708, 1736-1737, 1740-1744 of which some pages are duplicate drafts. The final version of these documents withheld in part with applicable exemptions are located at DHS OIG 1687, 1702, 1745-1749.

55.    When determining whether to withhold information under both Exemptions 6 and 7(C), DHS OIG further assessed whether the individual involved had a substantial privacy interest that would outweigh any public interest in disclosure.  As discussed in DHS OIG's *Vaughn* Index, Ex. 5, in reviewing the responsive records, DHS OIG withheld the names and other identifying information that apply to an individual, including DHS OIG's subjects, witnesses, complainants, and third parties mentioned or involved in the DHS OIG investigation, including medical professionals and lower-level government employees.  In addition, DHS OIG also withheld the names of other identifying information of DHS lower-level investigative personnel and law enforcement officers.  Other identifying information includes alien numbers, email addresses, direct telephone numbers, signatures, and identifying physical characteristics.   DHS OIG determined that all of these individuals have a substantial privacy interest that would be implicated by the public release of the law enforcement investigative materials and, Plaintiff provided no authorization from those third parties, whose name and other identifying information is withheld, that would otherwise permit DHS OIG to release their records to Plaintiff, nor supplied proof of death.  6 C.F.R. § 5.3(a)(4).  Accordingly, DHS OIG then balanced the privacy interest of these individuals with any FOIA public interest.  In order to constitute a FOIA public interest, the information must shed light on the working of the government in the performance of its statutory duties and and/or mission and any non-disclosure must outweigh the FOIA public interest.[9]  DHS OIG's operation is investigating criminal, civil, and administrative misconduct of DHS employees.

---

[9]    *McGegee v. DOJ*, 800 F. Supp. 2d 220, 234 (D.D.C. 2011) ("the relevant question is not whether the public would like to know the names of FBI agents and victims involved, but whether knowing those names would shed light on the FBI's performance of its statutory duties.")

56.    "Substantial privacy interests cognizable under the FOIA are generally found to exist in personal identifiable information as a person's name, physical address, email address, image, computer user ID, phone number, date of birth, criminal history, medical history, and social security number."[10]

57.    *Names and other identifying information of DHS OIG Subjects*.   DHS OIG specifically withheld the names and other identifying information of subjects contained in investigative records.  Being identified as a subject of a DHS OIG investigation carries a strong negative connotation and a stigma, regardless of whether these individuals ever committed misconduct.  Release of the identities of these individuals to the public could subject them to harassment and embarrassment, as well as undue public attention.  Furthermore, it could result in professional and social repercussions.  Accordingly DHS OIG determined that these individuals maintain substantial privacy interests in not having their identities disclosed.  In contrast, disclosing personal information about these individuals would not shed light on or significantly increase the public's understanding of DHS OIG's operations and activities, which is to investigate criminal, civil, and administrative misconduct of DHS employees, which the compiled Reports of Investigation and finalized Memorandum of Activity provide instead.  Thus, disclosure of these individual's personal information would amount to a clearly unwarranted invasion of their personal privacy.  In addition, under Inspector General Act of 1978, DHS OIG has a statutory obligation to protect a complainant's or witness's identity, which factored into DHS OIG's asserting Exemption 6 and Exemption 7(C) to protect the substantial privacy interest of DHS employees and third parties named in these records.

---

[10]     *Dep't of State v. Wash. Post Co*., 456 U.S. 595, 600 (1982).

58.    *Names and other identifying information of DHS OIG witnesses and complainants*. DHS OIG specifically withheld the names and other identifying information of witnesses and complainants contained in investigative records who provided or could provide information to DHS OIG during its investigations.  The release of names and other identifying information of witnesses and complainants contained in these investigative files could subject these individuals to especially serious harassment, intimidation, physical harm, and suspicion because of any negative connotation in the disclosure of information regarding purported criminal, civil, and administrative misconduct. This fear of reprisal, moreover, creates a tendency to withhold information that undermines the mission of DHS OIG to investigate misconduct.  To surmount this fear, identifying information must be held in strict confidence.

59.    Accordingly, DHS OIG determined that these individuals maintain substantial privacy interests in not having their identities disclosed.   In contrast, disclosing personal information about these individuals would not shed light on or significantly increase the public's understanding of DHS OIG's operations and activities, which is to investigate criminal, civil, and administrative misconduct of DHS employees, which the compiled Reports of Investigation and finalized Memorandum of Activity provide instead.   Thus, disclosure of these individual's personal information would amount to a clearly unwarranted invasion of their personal privacy. In addition, under Inspector General Act of 1978, DHS OIG has a statutory obligation to protect a complainant's or witness's identity, which factored into DHS OIG's asserting Exemption 6 and Exemption 7(C) to protect the substantial privacy interest of DHS employees and third parties named in these records.

60.    *Names and other identifying information of other medical professionals and lower-level government employees mentioned or involved in DHS OIG investigation.*   DHS OIG

specifically withheld the names and other identifying information of other third-party names and identifiable information, including lower-level government employees and medical professionals contained in these investigative files could subject these individuals to clearly unwarranted intrusion on their privacy interests. Publicity, adverse or otherwise, concerning the assistance of these government employees and medical professionals in a DHS OIG investigation or with DHS OIG investigative activities would seriously impair these professionals' effectiveness in assisting with or participating in future investigations or investigative activities. The privacy consideration also protects these individuals from unnecessary, unofficial questioning regarding the investigation. The publicity associated with the release of their names or other identifying information in connection with the investigation could also trigger hostility toward these employees. In contrast, there is no public interest to be served by the disclosure of these employees' names or other identifying information because information about these individuals would not shed light on or significantly increase the public's understanding of DHS OIG's operations and activities, which is to investigate criminal, civil, and administrative misconduct of DHS employees, which are documented in the compiled Reports of Investigation and finalized Memorandum of Activity provide instead. In addition, DHS OIG has not withheld titles and positions and the facts surrounding the allegations and OIG investigations. Thus, DHS OIG concluded that the release of this information would cause a clearly unwarranted invasion of personal property and therefore properly withheld this information pursuant to FOIA Exemptions 6 and 7(C).

61.    *Names of DHS OIG lower-level investigative personnel and law enforcement personnel.* DHS OIG withheld the names and other identifying information of DHS OIG lower-level investigative personnel and law enforcement personnel. The rational for protecting the

identities of these investigative personnel and law enforcement is publicity, adverse or otherwise, arising from a particular investigation, may seriously prejudice these individual's effectiveness in conducting investigations and in performing day-to-day work. This is because the nature of DHS OIG's work is often sensitive.  Disclosing their identities could, therefore, subject them to harassment that would also invade their privacy and could cause them to be targeted by those with strong opinions either way toward the entity or person being investigated.  In contrast, DHS OIG concluded that there is no public interest served by the disclosure of these individuals' identity to the general public.  Information about these individuals would not shed light on or significantly increase the public's understanding of DHS OIG's operations and activities, which is to investigate criminal, civil, and administrative misconduct of DHS employees, which the compiled Reports of Investigation and finalized Memorandum of Activity provide instead.  Accordingly, the release of this information would cause a clearly unwarranted invasion of personal property and, therefore, DHS OIG properly withheld this information pursuant to FOIA Exemptions 6 and 7(C).

62.     In Plaintiff's letter dated May 23, 2022 identifying challenges to DHS OIG's production, Plaintiff indicated challenges to "(c) ALL applications of Exemptions 6 and 7C to cover email domains, and failures to reasonably segregate those records; (d) ALL applications of Exemptions 6 and 7C to names of government officials and medical professionals; (e) ALL Block redactions to addresses under Exemptions 6 and 7C, e.g., p.33 of Tenth Interim Response." Although Plaintiff agreed to identify some of these challenged Exemption 6 and 7(C) withholdings by bates numbers so that OIG could re-review them, Plaintiff never identified these bates numbers. *See*

63.     With regard to names of government officials and medical professionals, as discussed above, DHS OIG's application of Exemption 6 and 7(C) to protect the names and

identifying information of lower-level DHS employees, OIG investigative personnel, and medical professionals was justified because in conducting its analysis under the FOIA, it was determined that the release of the names and identifying information of these individuals would cause a clearly unwarranted invasion of their personal privacy.

64.    With regard to email domains and addresses, identifying information includes but is not limited to email addresses and addresses.  In reviewing the responsive records, however, DHS OIG did not withhold email domains of government agencies where they were able to be reasonable segregated and any releasable portions of email addresses that did not provide identifying information, which included the agency's email domain (e.g., @oig.dhs.gov and @ice.dhs.gov) were disclosed. DHS OIG, likewise, did not identify any addresses that were withheld on the pages to which Plaintiff directed.  Rather on those pages, DHS OIG applied Exemptions 6 and 7(C) to the portion of a large grouping of email addresses that would provide the identification of the individual, such as the individual's name and/or initials. In instances, where multiple individual's names were indicated in a string of names in the Recipient header (To:) of the email, those names were redacted, which gave the appearance of "block" redactions, but were not.

65.    The FOIA unit has considered the foreseeable harm standard when reviewing the records and applying FOIA exemptions (b)(6) and (b)(7)(C).  During the course of an OIG criminal, civil, or administrative investigation, those individuals involve, such as witnesses and complainants provide sensitive information as part of the OIG investigation, which may subject them to harassment and/or embarrassment if their identity is revealed.  Further, the disclosure of the identity and identifying information of DHS OIG's third-party witnesses or complainants will impede DHS OIG's ability to conduct future investigations.  If a witness or complainant is aware

that their identity will be disclosed, he or she may be less forthcoming or less likely to provide information during the course of an OIG investigation.  DHS OIG's Office of Investigations rely on truthful information and candid discussions with witnesses to assist in the determination as to whether allegations are substantiated or unsubstantiated.

66.    To disclose the identity of an OIG witness, will deter both witnesses and complainants from being forthcoming for fear of harassment and/or retaliation. Not providing protection of witnesses, will not only result in a chilling effect, but also hinder DHS OIG's ability to fulfill its mission of providing independent oversight and detecting waste, fraud, and abuse in future investigations.

67.    Therefore, law enforcement officers, DHS OIG's investigative personnel and all individuals serving in a witness capacity during DHS OIG's investigation, were afforded protection of their substantial privacy interests.  DHS OIG segregated all releasable portions.

## VI.    SEGREGABILITY

68.    U.S.C. § 552(b) requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

69.    A line-by-line review of all records produced to Plaintiff was conducted to identify all information exempt from disclosure or for which a discretionary waiver of exemption could be applied.

70.    With respect to the records that were released, all information not exempted from disclosure pursuant to the FOIA Exemptions specified above was correctly segregated and non-exempt portions were released.  DHS OIG did not withhold any non-exempt information on the grounds that it was non-segregable.  Any further release of information would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions.

71.    Accordingly, DHS OIG released all reasonably segregable potions of records responsive to Plaintiff's request, the release of which would not cause foreseeable harm.

## VII.    JURAT CLAUSE

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.  Signed this _____ day of _____ 2023.

ROY
JONES III | Digitally signed
by ROY JONES III
Date: 2023.06.16
09:16:59 -04'00'
_____

Roy Jones

FOIA Officer

Information Law and Disclosure Division, FOIA Division

U.S. Department of Homeland Security

Office of Inspector General